UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ASHLEY THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 14-13819-JGD |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION AND ORDER ON CROSS-MOTIONS REGARDING DENIAL OF SOCIAL SECURITY BENEFITS

March 24, 2016

DEIN, U.S.M.J.

### I.  INTRODUCTION

The plaintiff, Ashley Thomas ("Thomas"), has brought this action pursuant to sections

205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), in order to

challenge the final decision of the Commissioner of the Social Security Administration

("Commissioner") denying her claim for Social Security Income ("SSI") benefits.  The matter is

presently before the court on the plaintiff's "Motion to Reverse" (Docket No. 13), by which

Thomas is seeking an order reversing the Commissioner's decision and granting her claim for

benefits, or in the alternative, remanding the matter to the Social Security Administration for

further administrative proceedings.  It is also before the court on the "Defendant's Motion to

Affirm the Commissioner's Decision" (Docket No. 25), by which the Commissioner is seeking an

order upholding her determination that Thomas is not disabled within the meaning of the Social

Security Act, and is therefore not entitled to an award of SSI benefits.  The principal issue raised

by the parties' motions is whether the Administrative Law Judge ("ALJ"), in reaching her

decision that Thomas was not disabled, erred by failing to include certain cognitive limitations

in the hypothetical questions that she posed to the Vocational Expert ("VE"), and by failing to

address the VE's testimony, on cross-examination, that an individual with such cognitive

limitations would be precluded from carrying out any type of gainful employment activity.  For

all the reasons detailed below, this court finds that the ALJ committed no error and that her

decision was supported by substantial evidence.  Therefore, the plaintiff's motion to reverse or

remand is DENIED, and the defendant's motion to affirm is ALLOWED.

## II.  <u>STATEMENT OF FACTS</u>[1]

Thomas was born on December 15, 1988, and was 25 years old at the time of her

hearing before the ALJ.  (Tr. 23).   She received special education services beginning in the sixth

grade, and dropped out of school before completing the ninth grade.  (Tr. 23-24, 405, 614).

Thomas has not obtained a GED or pursued any additional education since that time.  (<u>See</u> Tr.

614).  Although Thomas was living with a boyfriend when she applied for SSI benefits, she

remains single and does not have any children.  (<u>See</u> Tr. 24, 614).

The record indicates that Thomas has difficulty getting along with others, and has a

history of psychiatric impairments.  (<u>See</u> Tr. 612-13).  It also indicates that Thomas has had very

little employment experience.  (<u>See</u> Tr. 26-27, 145, 612).  Although she was able to find some

work through a temp agency in 2012, Thomas contends that she "flipped out and walked off

---

[1] References to pages in the transcript of the record proceedings shall be cited as "Tr.__."  The ALJ's Decision shall be cited as "Dec." and can be found beginning at Tr. 10.

the job" after working for only about one month. (Tr. 27, 612). She further contends that she has been disabled since 2009 due to hearing loss in her right ear, memory loss, seizures, anemia, lactose intolerance and a number of psychiatric conditions including bipolar disorder, schizophrenia, depression and attention deficit disorder. (Tr. 126, 144).

### Procedural History

On April 22, 2013, Thomas filed an application for SSI, claiming that she had been unable to work since July 31, 2009. (Tr. 126). Her application was denied initially on June 18, 2013, and upon reconsideration on January 7, 2014. (Tr. 45-67). The plaintiff then requested and was granted a hearing before an ALJ, which took place on June 26, 2014. (Tr. 20-44, 77-78, 92-97). Thomas, who was represented by counsel, appeared and testified at the hearing. (Tr. 23-34). She also called Aaron Henderson, one of her long-time friends, to testify on her behalf. (Tr. 35-39). In addition, the ALJ elicited testimony from Dr. Robert Lasky, a psychologist and vocational consultant who appeared in his capacity as a VE. (Tr. 39; see also Tr. 110). Dr. Lasky responded to hypothetical questions, which were aimed at determining whether jobs exist in the national and regional economies for an individual with the same age, educational background, work experience and residual functional capacity ("RFC") as the plaintiff. (Tr. 39-44). Thomas claims that the ALJ committed reversible error by failing to include all of her mental limitations in the hypothetical question that she posed to Dr. Lasky, and by failing to credit Dr. Lasky's responses to the questions posed by her counsel. However, this court finds that no error occurred, and that the ALJ's treatment of Dr. Lasky's testimony was appropriate.

Significantly, during the hearing, the ALJ asked Dr. Lasky the following hypothetical question:

> Assume a person of the Claimant's age, education, work experience. This person would be limited to simple, routine tasks; occasional decision making; occasional changes in the work setting; no interaction with the public. I'm going to further say the work is isolated with only occasional supervision, no tandem tasks of any kind. Can you identify any jobs?

(Tr. 39). Dr. Lasky responded that such an individual would have the ability to carry out the unskilled jobs of a mail clerk, a sealer of semi-conductor packages and an inspector of electrical equipment. (Tr. 39-40). He also confirmed that each of those jobs involved isolated work, and existed in significant numbers in the national and regional economies. (See Tr. 40). As described below, the ALJ relied on Dr. Lasky's response to this question to determine that the plaintiff was capable of working, and was not under a disability within the meaning of the Social Security Act.

After the VE responded to the ALJ's hypothetical question, Thomas' counsel was given an opportunity to conduct cross-examination. (Tr. 40-44). During the examination, plaintiff's counsel questioned Dr. Lasky about the aptitudes necessary to perform each of the jobs that he had described in response to the ALJ's question. (Tr. 41). In particular, plaintiff's counsel asked Dr. Lasky the following questions and received the following answers:

> Q   And if our hypothetical person was in the lowest ten percent of general learning ability, based on their IQ scores, would that be consistent with the aptitudes for the jobs you've given us?
>
> A   If the person is at the very lowest level, chances are that would significantly compromise their ability to perform most work even at the unskilled level.
>
> Q   Okay.
>
> A   In the particular jobs that we have here, the levels that are included – let me give you a couple of examples.

Q   Please?

A   If we take a look at the inspector job, for example, this is at the kind
    of general learning ability that's needed for that is certainly – well,
    they say, the <u>DOT</u>, 11 to 33rd percentile, and that's down in the lower
    third, not in the lower ten percent so that's quite low.  General
    learning ability in the mail clerk position is also down relatively low.
    That's in the 34th to 66th percentile and so these are low but not as
    low as you're suggesting.

Q   Okay.  So if our hypothetical person was in the lowest ten percent,
    that would be below the aptitudes listed for these jobs?

A   I believe so because certainly this would indicate – strongly suggest a
    learning disability which would certainly compromise employability.

(Tr. 41-42).  Thomas argues that her IQ scores placed her in the 8th percentile of the

population.  (Pl. Mem. (Docket No. 13) at 5-6).  She also argues that the ALJ committed

reversible error by failing to credit, or even consider, Dr. Lasky's testimony indicating that an

individual with Thomas' IQ would be unemployable.

After questioning Dr. Lasky about the aptitudes needed to perform each of the jobs he

identified, plaintiff's counsel asked him to respond to the following hypothetical question:

Okay.  And, Dr. Lasky, I'd like you to assume that our hypothetical person
has been diagnosed as having borderline personality disorder and bear
with me while I get this – and that would mean that the psychologist who
made the diagnosis found a pervasive pattern of instability of
interpersonal relationships, self-image and affect and marked impulsivity
beginning at early adulthood present in a variety of context[s], we're
assuming in the work context, indicated by five or more of the following
which would be frantic efforts to avoid real or imagined abandonment, a
pattern of unstable and intense interpersonal relationships characterized
by alternating between extremes of idealization[,] evaluation, identities
disturbance[,] markedly and persistently unstable self-image or sense of
self, impulsivity in at least two areas that are potentially self-damaging
such as spending, sex, substance abuse, reckless driving, et cetera,
recurrent suicidal behavior gestures or threats or self-mutilating
behavior, affective instability due to a marked reactivity of mood, chronic
feelings of emptiness, inappropriate intense anger or difficulty controlling

anger, transient stress-related paranoid ideation or severe dissociated
symptoms.  If we have a person described by that definition, doctor, do
you have any opinion as to whether or not that would affect their ability
to do these three jobs or other jobs in the general economy?

(Tr. 42-43).  In his response, Dr. Lasky stated in relevant part: "Assuming that that would

compromise their time on task, 20 percent or more, which would be reasonable given these

conditions, that would likely preclude employability in my opinion."  (Tr. 43).  As described

below, the ALJ found that Thomas was suffering from a number of severe mental impairments,

including a personality disorder.  (Dec. Finding #2; Tr. 12).  Moreover, there is no dispute that

plaintiff's counsel was essentially quoting from the fourth edition of the American Psychiatric

Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") when he

defined the term "borderline personality disorder" in his question to Dr. Lasky.  (Def. Mem.

(Docket No. 26) at 14; Pl. Resp. (Docket No. 27) at 5).  Thus, Thomas contends that the ALJ's

failure to credit or consider Dr. Lasky's testimony on this issue warrants a reversal of her

decision as well.

On July 24, 2014, the ALJ issued a decision denying Thomas' claim for benefits.  (Tr. 7-

18).  Thomas then filed a request for review of the ALJ's decision by the Social Security Appeals

Council.  (Tr. 5-6).  On August 6, 2014, the Appeals Council denied the plaintiff's request for

review, thereby making the ALJ's decision the final decision of the Commissioner for purposes

of review.  (Tr. 1-3).  Accordingly, the plaintiff has exhausted all of her administrative remedies,

and the case is ripe for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**The ALJ's Decision**

A claimant is not entitled to SSI benefits unless she is "disabled" within the meaning of

the Social Security Act, which defines "disability" as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). In the instant case, the ALJ concluded that Thomas "ha[d] not been under a disability, as defined in the Social Security Act, since April 22, 2013, the date [her] application was filed. (Dec. Finding #10; Tr. 18 (citation omitted)). There is no dispute that the ALJ, in reaching her decision that Thomas was not disabled, performed the five-step sequential evaluation required by 20 C.F.R. § 416.920. The procedure resulted in the following analysis, which is detailed further in the ALJ's "Findings of Fact and Conclusions of Law." (See Dec. 3-9; Tr. 12-18).

The first inquiry in the five step evaluation process is whether the claimant is "engaged in substantial gainful work activity[.]" Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). If so, the claimant is automatically considered not disabled and the application for benefits is denied. See id. In this case, the ALJ found that Thomas had not engaged in such activity since the date of her application on April 22, 2013. (Dec. Finding #1; Tr. 12). Accordingly, she proceeded to the second step in the sequential analysis.

The second inquiry is whether the claimant has a "severe impairment," meaning an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 416.920(c). If not, the claimant is deemed not to be disabled and the application for benefits is denied. See Seavey, 276 F.3d at 5. Here, the ALJ found that Thomas suffered from a number of severe mental impairments, including "bipolar disorder, posttraumatic stress disorder, attention deficit disorder, personality disorder, [and] schizophrenia." (Dec. Finding #2; Tr. 12 (citation omitted)). However, she

determined that Thomas' alleged physical impairments, including her hearing loss, anemia, seizures and lactose intolerance were not severe.  (Dec. 3-4; Tr. 12-13).   The plaintiff has not challenged this finding on appeal.

Because the ALJ determined that Thomas had impairments that were severe, she proceeded to step three in the regulatory analysis.  The third inquiry is whether the claimant has an impairment equivalent to a specific list of impairments contained in Appendix 1 of the Social Security regulations.  See Seavey, 276 F.3d at 5; 20 C.F.R. § 416.920(d).  At this step, the ALJ concluded that Thomas' impairments, either alone or in combination, did not meet or medically equal any of the listed impairments.  (Dec. Finding #3; Tr. 13).  Therefore, her analysis continued.[2]

The fourth inquiry in the five-step evaluation process asks whether "the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work[.]"  Seavey, 276 F.3d at 5.  Thus, in order to answer this question, the ALJ must first determine the claimant's RFC.  In the instant case, the ALJ concluded as follows with respect to Thomas' RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to isolated work with no more than occasional supervision and no tandem tasks, and must avoid interaction with the general public; and is limited to simple routine tasks involving no more than occasional decision making and work setting changes.

---

[2] In connection with her finding at step three of the sequential analysis, the ALJ found that Thomas had not experienced any repeated episodes of decompensation, each of extended duration.  (See Dec. 4-5; Tr. 13-14).  The plaintiff argues that this finding is inconsistent with the opinions of two state agency psychologists, Cornelius Neil Kiley, Ph.D. and Julie Cohen, Ph.D.  (Pl. Mem. at 2).  Both Dr. Kiley and Dr. Cohen reported that Thomas had experienced "One or Two" such episodes.  (Tr. 49-50, 62).  Nevertheless, the plaintiff does not challenge the ALJ's conclusion that Thomas' impairments did not meet or medically equal any of the listed impairments, or urge the court to reverse the Commissioner's decision on this basis.  Therefore, this court finds that it is not necessary to further address this issue.

(Dec. Finding #4; Tr. 14).   Thomas contends that this finding failed to reflect the limiting effects of both her personality disorder and her IQ score, and that the ALJ committed reversible error by including that finding in the hypothetical question that she posed to Dr. Lasky at the hearing and relying on Dr. Lasky's response to that question to conclude that Thomas was not disabled.

In reaching her conclusion regarding Thomas' RFC, the ALJ considered the plaintiff's testimony at the hearing, the objective medical evidence of record, the testimony of Thomas' friend, Aaron Henderson, and the available opinion evidence.  (Dec. 5-7; Tr. 14-16).  Although Thomas had alleged a disability onset date in 2009, the ALJ found little evidence of any ongoing mental health treatment prior to 2011.  (Dec. 6; Tr. 15).  She also noted that while Thomas' treatment records from 2011 and 2012 reflected diagnoses of bipolar disorder, posttraumatic stress disorder, personality disorder, attention deficit disorder and schizophrenia, they contained few abnormal objective findings.  (Id.).  Moreover, the ALJ found that the record contained "no evidence of any ongoing, dedicated mental health treatment since 2012[,]" and that Thomas had denied any suicidal thoughts, and had displayed intact thought process and memory, during a consultative psychological examination in 2013.  (Id.).

The ALJ considered available records from Thomas' childhood, which showed that the plaintiff had experienced discipline issues and difficulties with reading and math, and had received special education services.  (Id.).  They also contained results from various cognitive tests that had been administered to the plaintiff years prior to the alleged onset of her disability in 2009.  (See id.).  Notably, however, the ALJ rejected the plaintiff's claim that the test results established any significant cognitive deficits.  Thus, as the ALJ explained:

> cognitive testing was inconsistent, showing borderline scores, (Exhibit 15E page 61), then also scores in the low average range (Exhibit 15E page

> 80).  The claimant's attorney argues that she has significant cognitive
> deficits, but again there are scores showing at least the low average
> range, and she also reported performing activities such as shopping and
> being able to handle money despite her mental impairments, (Exhibits
> 4E, 7E), which further does not support significant cognitive deficits.

(Id.).  This court finds that the ALJ's findings on this issue are supported by substantial evidence.

In connection with her determination regarding the plaintiff's RFC, the ALJ considered

the effects of the plaintiff's mental impairments on her activities of daily living, social

functioning and ability to maintain concentration, persistence, or pace.  (Dec. 7; Tr. 16).  The ALJ

found that Thomas had "no more than mild restriction" with respect to her activities of daily

living, "no more than moderate difficulties" with respect to social functioning, and "no more

than moderate difficulties" with respect to concentration, persistence, or pace.  (Id.).  In order

to account for the moderate difficulties in social functioning, the ALJ explained that she had

limited Thomas' RFC "to isolated work with no more than occasional supervision, no tandem

tasks, and avoiding interaction with the general public."  (Id.).  She further explained that she

had included additional limitations in Thomas' RFC to account for her moderate difficulties in

concentration, persistence, or pace.  (Id.).  As the ALJ stated:

> In light of objective findings of varying moods, difficulty performing some
> calculations during consultative examination, and low average cognitive
> scores during testing in school, I have included [RFC] limitations to simple
> routine tasks involving no more than occasional decision making and
> work setting changes.  However, there is no evidence of any ongoing,
> dedicated mental health treatment since 2012 and also limited abnormal
> objective findings through then.  During consultative psychological
> examination in 2013, intact thought process and memory were observed.
> Despite her mental impairments, the claimant reported performing
> activities such as shopping, taking public transportation, and being able
> to handle money.

(Id.).

After explaining the basis for her RFC determination, the ALJ concluded that Thomas had no past relevant work.  (Dec. Finding #5; Tr. 16).  Consequently, she reached the fifth and final step in the disability analysis.

The fifth inquiry is whether, given the claimant's RFC, education, work experience and age, the claimant is capable of performing other work.  See Seavey, 276 F.3d at 5; 20 C.F.R. § 416.920(g).  If so, the claimant is not disabled.  20 C.F.R. § 416.920(g).  At step five, the Commissioner has the burden "of coming forward with evidence of specific jobs in the national economy that the applicant can still perform."  Seavey, 276 F.3d at 5.  In this case, the ALJ relied on Dr. Lasky's response to the first hypothetical question to conclude that Thomas was capable of performing work that exists in significant numbers in the national economy, including the unskilled work of a mail clerk, sealer and electrical equipment inspector.  (Dec. 8; Tr. 17).  Therefore, the ALJ found that Thomas was not disabled under the Social Security Act.  (Dec. 9; Tr. 18).  The plaintiff challenges the ALJ's finding at step 5, and contends that it was not based on substantial evidence.  This court disagrees, and concludes that the ALJ's findings at this stage were proper and must be upheld on appeal.

Additional factual details relevant to this court's analysis are described below where appropriate.

### III.  ANALYSIS

#### A.    Standard of Review

In this action, Thomas is seeking judicial review of the Commissioner's "final decision" pursuant to section 205(g) of the Social Security Act, 42 U.S.C § 405(g) (the "Act").  Section 205(g) provides in relevant part as follows:

> Any individual, after any final decision of the Commissioner of Social
> Security made after a hearing to which he was a party, irrespective of the
> amount in controversy, may obtain a review of such decision by a civil
> action …. The court shall have power to enter, upon the pleadings and
> transcript of the record, a judgment affirming, modifying, or reversing the
> decision of the Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of the Commissioner
> of Social Security as to any fact, if supported by *substantial evidence*, shall
> be conclusive ….

42 U.S.C. § 405(g) (emphasis added).  The Supreme Court has defined "substantial evidence" to

mean "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct.

1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.

Ct. 206, 217, 83 L. Ed. 126 (1938)); accord Irlanda Ortiz v. Sec'y of Health & Human Servs., 955

F.2d 765, 769 (1st Cir. 1991).

As the First Circuit has explained:

> In reviewing the record for substantial evidence, we are to keep in mind
> that "issues of credibility and the drawing of permissible inference from
> evidentiary facts are the prime responsibility of the [Commissioner]."
> The [Commissioner] may (and, under [her] regulations, must) take
> medical evidence.  But the resolution of conflicts in the evidence and the
> determination of the ultimate question of disability is for [her], not for
> the doctors or for the courts.  We must uphold the [Commissioner's]
> findings in this case if a reasonable mind, reviewing the record as a
> whole, could accept it as adequate to support [her] conclusion.

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (quoting Rodriguez

v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  Therefore, "the court's

function is a narrow one limited to determining whether there is substantial evidence to

support the [Commissioner's] findings and whether the decision conformed to statutory

requirements."  Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981).

The Commissioner's decision must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987).

"Even in the presence of substantial evidence, however, the Court may review conclusions of law, and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.'" <u>Musto v. Halter</u>, 135 F. Supp. 2d 220, 225 (D. Mass. 2001) (quoting <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam)) (internal citations omitted). "Thus, if the ALJ made a legal or factual error, the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard." <u>Ross v. Astrue</u>, C.A. No. 09-11392-DJC, 2011 WL 2110217, at *2 (D. Mass. May 26, 2011) (internal citation omitted).

**B.**     <u>**Alleged Failure to Account for Thomas' IQ Score**</u>

The plaintiff argues that the ALJ's decision to deny her claim for benefits at step five in the sequential analysis must be reversed or remanded because the ALJ failed to incorporate Thomas' low IQ score into the hypothetical question that she posed to the VE at the hearing, and because the ALJ relied on the response to that question without addressing the VE's testimony, on cross-examination, that an individual with such an IQ score would be precluded from working.[3] (<u>See</u> Pl. Mem. at 5-8; Pl. Resp. at 2-4). At step five in the analytical process, the Commissioner must provide evidence that the claimant can still perform work that exists in

---

[3] The Commissioner argues that Thomas waived this argument because she did not claim disability based on her cognitive limitations. (Def. Mem. (Docket No. 26) at 10). This argument is not persuasive. As the ALJ recognized in her written decision, the plaintiff did argue at the administrative level that she was suffering from significant cognitive deficits. (Dec. 6; Tr. 15). In fact, the record shows that in a letter to the ALJ dated prior to the hearing, Thomas' counsel highlighted the IQ score which is currently at issue in this litigation. (Tr. 124).

significant numbers in the national economy.  See Seavey, 276 F.3d at 5.  "The opinion of a

vocational expert that a Social Security claimant can perform certain jobs qualifies as

substantial evidence at the fifth step of the analysis."  Sousa v. Astrue, 783 F. Supp. 2d 226, 235

(D. Mass. 2011).  "In order to be substantial evidence, however, the opinion of the vocational

expert must be in response to a hypothetical that accurately describes the claimant's

limitations."  Id.  This court finds that there was substantial support for the ALJ's decision not to

incorporate the low IQ score into her hypothetical question or to credit Dr. Lasky's testimony

that a claimant with such an IQ score would not be employable.  Therefore, Thomas has not

shown that she is entitled to relief on this basis.

Thomas' argument is based on her score on the Stanford-Binet Intelligence Scale.  (See

Pl. Mem. at 5-6).  The record establishes that Joseph C. McCarty, Ph.D., a psychological

examiner and certified school psychologist, administered that test to the plaintiff in July 2003,

when she was 14 years old.  (See Tr. 437, 441-46).  The test resulted in a total composite score

of 77, which placed Thomas in the 8th percentile.  (Tr. 441).  Although the ALJ did not explicitly

discuss the details of Dr. McCarty's test results in her written decision, she indicated that she

had reviewed the plaintiff's school records, including the records of her cognitive testing and

borderline IQ test results.  (Dec. 6; Tr. 15).  However, the ALJ found that those records failed to

support Thomas' claim of significant cognitive deficits or disabling mental impairments.  (Id.).

This court finds that her conclusions on these matters were based on substantial evidence, and

that her decision not to credit the IQ score at issue was justified.

The ALJ provided several reasons for rejecting Thomas' claim of significant cognitive

deficits.  First, that ALJ noted that the records reflecting the plaintiff's cognitive difficulties were

generated during Thomas' childhood, but that Thomas did not claim to be disabled until 2009, when she was 20 years old.  (Id.).  She also noted that in 2013, during the time period relevant to Thomas' claim of disability, a consulting psychologist examined the plaintiff and found that both her memory and thought process were intact.  (Id.).  Thus, the ALJ appropriately found that both the alleged onset date and the more recent evidence of Thomas' cognitive abilities were inconsistent with her borderline IQ scores.

Next, the ALJ found it significant that Thomas' test results were themselves inconsistent. (Id.).  As the ALJ explained, "cognitive testing was inconsistent, showing borderline scores, then also scores in the low average range."  (Id. (citations omitted)).   She determined that the scores in the low average range were at odds with Thomas' claim of disabling cognitive deficits.  (See id.).

The ALJ's view of Thomas' scores is supported by Dr. McCarty's interpretation of the results of the Stanford-Binet Intelligence Scale.  As Dr. McCarty stated in his written report:

> [i]n cognitive testing, the majority of [Thomas'] scale scores were either
> within or bordering the low average range, which led to mid-low average
> range area scores for verbal and abstract nonverbal reasoning.  She had
> marked weaknesses in manipulating basic math facts and remembering
> numbers, which led to three borderline intellectual functioning range
> subscale scores that in turn lowered her quantitative reasoning and
> short-term memory area scores to that range.  The other exception from
> the low average range trend was a mid-average scale score for
> meticulous pencil reproductions of geometric shapes, her highest score.
> This skill, in tandem with the majority of her short-term memory
> subscales being in the same range as the rest of her cognitive
> performance, would seem to contraindicate the presence of a clinical
> attention problem distinct from her generally mildly decreased cognitive
> skills ….

(Tr. 443).  Thus, Dr. McCarty concluded that "[c]ognitively, [Thomas'] profile was largely in the low average range, with specific deficits in basic number memory and usage that lowered

15

several of her composite scores to the borderline impaired range." (Tr. 445). It was up to the

ALJ to weigh such inconsistencies, and to determine what impact they had on the plaintiff's

functional capacity. See Lizotte, 654 F.2d at 128 (explaining that authority for resolving

conflicts in the evidence belongs to the Commissioner). Therefore, her decision to credit the

low average scores over the plaintiff's borderline IQ scores did not constitute error.

The plaintiff takes issue with the ALJ's conclusion that her cognitive tests results were

"inconsistent," and contends that the VE, "Dr. Lasky, as a professional psychologist, can be

assumed to understand that it is the overall or full scale score (referred to on the Stanford-

Binet as the 'Test Composite Score') that is the best indicator of general learning ability, not the

other scores." (Pl. Resp. at 3). This argument is insufficient to establish reversible error. As an

initial matter, there is no evidence, either from Dr. Lasky or elsewhere in the record, to support

the plaintiff's assertion that her full scale score on an IQ test that was administered during her

childhood was the best indicator of her cognitive abilities during the time period at issue.

Furthermore, nothing in the record indicates that Dr. Lasky, who testified in his capacity as a VE

at the hearing, reviewed any of the plaintiff's records or had any specific information regarding

the cognitive tests that were administered to her. During cross-examination, plaintiff's counsel

merely asked Dr. Lasky to assume that the claimant "was in the lowest ten percent of general

learning ability, based on [her] IQ scores[.]"[4] (Tr. 41). Thus, Dr. Lasky had no opportunity to

consider specific facts such as the type of test that was administered, the context in which it

---

[4] Although the parties have not addressed the issue in this case, a number of courts have rejected claimants' efforts to equate general learning ability with IQ scores. See Griffith v. Comm'r of Soc. Sec., 582 Fed. Appx. 555, 565 & n.7 (6th Cir. 2014) (listing cases). Therefore, it is far from clear that counsel's hypothetical question to the VE accurately described the plaintiff's "General Learning Ability" as that term is used in the Dictionary of Occupational Titles. See id. (noting that plaintiff "improperly conflates I.Q. with General Learning Ability").

was given, or Dr. McCarty's comments regarding his interpretation of the test results. Accordingly, there is no basis to assume that the VE had any specific understanding regarding Thomas' test scores.

The plaintiff has submitted a letter from Barbara J. McKim, Ph.D., a Licensed Psychologist, in which Dr. McKim stated that in her opinion, "the Full Scale IQ score is apt to be most closely commensurate with general learning ability, as it assesses aspects of both verbal and performance abilities." (Pl. Resp., Ex. A). This too is insufficient to establish error on the part of the ALJ. First of all, there is no evidence showing that Dr. McKim had any relationship to the plaintiff or indicating why her opinion should be credited. Secondly, Dr. McKim's statements were made in the context of a discussion about the Wechsler Adult Intelligence Scale ("WAIS"), not the Stanford-Binet Intelligence Scale which Dr. McCarty administered to Thomas. (See id.). The record shows that Thomas was given the WAIS for children in 2000, when she was 11 years old, and obtained a full scale score of 82, which placed her in the low average range. (Tr. 478-81). Therefore, to the extent Dr. McKim's opinion has any relevance to the matters at issue in this action, it supports the ALJ's conclusion that the IQ tests were inconsistent, and resulted in scores in the low average range as well as in the borderline range.

The ALJ's final reason for rejecting Thomas' claim of significant cognitive defects was that her claim was inconsistent with Thomas' own reports of her abilities. For example, Thomas reported that she could perform activities such as shopping, and was able to use public transportation. (See Dec. 6; Tr. 15). She also reported that she was capable of handling her own money. (See id.). The ALJ found that this evidence "do[es] not support [Thomas'] subjective allegations of *totally* disabling mental symptoms." (Id.). In addition, the ALJ noted

that during the hearing, Thomas testified that she could probably work in a small, isolated environment, such as a small office without people.  (See id.; Tr. 34).  As the ALJ determined, such an admission does not support her claim of a disabling mental condition.  (See Dec. 6; Tr. 15).

"Although the hearing officer's hypothetical question must describe the claimant's impairments, the hearing officer is not obligated to present impairments to the vocational expert that have been deemed not credible."  Cohen v. Astrue, 851 F. Supp. 2d 277, 284 (D. Mass. 2012).  Because the ALJ properly found that Thomas' borderline test scores did not present a credible measure of the plaintiff's cognitive abilities, she was not required to include those scores in her hypothetical question to the VE.  Nor was she required to reconcile the VE's response to her hypothetical question with his testimony on cross-examination.  See Bowie v. Colvin, No. 2:12-cv-205-DBH, 2013 WL 1912913, at *9-10 (D. Me. Mar. 31, 2013) (rejecting plaintiff's argument that ALJ was required to address conflict between VE's testimony in response to ALJ's hypothetical question and IQ score placing her below the aptitudes necessary to perform work as an automobile detailer or car-wash attendant where ALJ found, and conveyed to the VE, that the plaintiff had the mental capacity to perform simple, repetitive activities, and the ALJ's finding on that issue was based on substantial evidence), aff'd, 2013 WL 1912938 (D. Me. May 7, 2013).  Accordingly, the ALJ's handling of Thomas' IQ score was appropriate and must be upheld.

### C.    Alleged Failure to Consider the Effects of Plaintiff's Personality Disorder

Thomas also asserts that the ALJ erred at step five in the sequential analysis because she failed to credit, or even address, Dr. Lasky's testimony that a claimant who displays all of the

characteristics of a borderline personality disorder, as that term is defined in the DSM-IV, would be off-task at least 20 percent of the time and would not be employable. (Pl. Mem. at 7-9; Pl. Resp. at 5-6). Again, this court finds that the ALJ's handling of this issue was supported by substantial evidence, and that it does not warrant a reversal or remand to the Commissioner for further administrative proceedings.

At step two in the five step evaluation process, the ALJ found that Thomas had a number of severe mental impairments, including a personality disorder. (Dec. Finding #2; Tr. 12). However, severe impairments, including psychological disorders, are "not in [themselves] sufficient to establish eligibility for benefits absent a proper showing of related functional loss." Sitar v. Schweiker, 671 F.2d 19, 20-21 (1st Cir. 1982). "For Social Security disability purposes, the issue is not whether an impairment exists, but whether it is sufficiently severe to prevent work." Stefanowich v. Colvin, Civil Action No. 13-20020-KPN, 2014 WL 357293, at *1 (D. Mass. Jan. 30, 2014). Moreover, the claimant bears the burden of proving the extent of any functional loss resulting from her severe psychological impairments. See Hardin v. Soc. Sec. Admin. Comm'r, Civil No. 1:09-cv-00496-JAW, 2010 WL 3885601, at *2 (D. Me. Sept. 28, 2010) ("claimant bears the burden of proving the limitations that factor into the Commissioner's residual functional capacity finding"), aff'd, 2010 WL 4134287 (D. Me. Oct. 19, 2010); 20 C.F.R. § 416.945(a)(3) ("In general, you [the claimant] are responsible for providing the evidence we will use to make a finding about your residual functional capacity").

Thomas has not identified any evidence in the medical record that addresses the amount of time that she would remain off-task due to symptoms of her personality disorder. Nor has she identified any evidence showing how her personality disorder would limit her

ability to function in a workplace setting. Instead, the plaintiff suggests that the ALJ's finding of a severe personality disorder was enough to show that she suffered from all of the symptoms listed in the DSM-IV. Because the VE testified that an individual with such symptoms would have a 20 percent off-task limitation and would not be employable, Thomas contends that she met her burden of showing that she suffered from disabling functional limitations. This court disagrees, and finds that the plaintiff's reasoning is unpersuasive.

The plaintiff acknowledges that in order to meet the criteria necessary to support a diagnosis of "borderline personality disorder" as defined in the DSM-IV, an individual need only satisfy a certain number of the symptoms listed in the definition. (See Pl. Resp. at 5-6). Nevertheless, in questioning the VE about the effects that Thomas' personality disorder would have had on her ability to work, plaintiff's counsel made no effort to link her diagnosis to any particular symptoms or functional limitations. Instead, he told the VE to assume that the hypothetical claimant who had been diagnosed as having a borderline personality disorder exhibited all of the symptoms listed in the DSM-IV, and he asked the VE to state whether a claimant with all of those symptoms would be able to perform the work of a mail clerk, a sealer, an inspector of electrical equipment or other jobs in the national economy. (See Tr. 42-43). The plaintiff's assertion that the ALJ was obligated to credit Dr. Lasky's response, and to find that Thomas would be off-task at least 20 percent of the workday, amounts to an argument that anyone diagnosed with a personality disorder is disabled per se. As described above, that argument is at odds with the relevant authority, which requires the claimant to establish the extent of any functional loss resulting from a severe impairment.

Thomas argues that her counsel's hypothetical was appropriate in this case because the physician who diagnosed her personality disorder, Emanuel Chris, M.D., determined that Thomas satisfied "*almost all* of the diagnostic criteria, as outlined in [the] DSM-IV."  (Pl. Resp. at 6).  While Dr. Chris reported that Thomas "matched up with almost all of the diagnostic criteria" of a borderline personality disorder (Tr. 615), he did not specify which of the criteria Thomas had satisfied.  Moreover, the record shows that his assessment was based on the plaintiff's subjective statements rather than his own objective findings.  The ALJ determined that Thomas' subjective statements were not entirely credible, and did not support her claim of totally disabling mental impairments.  Because her assessment of Thomas' credibility was based on substantial evidence, the ALJ did not err by disregarding Dr. Chris' statements regarding the extent of Thomas' symptoms.

The record shows that Dr. Chris conducted a consultative examination of the plaintiff on May 20, 2013.  (Tr. 612-16).  The examination included an interview of Thomas, as well as a mental status evaluation.  (Id.).  During the interview, Dr. Chris reviewed the diagnostic criteria set forth in the DSM-IV for borderline personality disorders.  (Tr. 613).  According to Dr. Chris' report of the examination, Thomas "agreed with the vast majority of those symptoms."  (Id.).  Thus, Dr. Chris relied on Thomas' subjective statements in determining that the plaintiff satisfied "almost all" of the relevant criteria.  (See Tr. 615).  Again, however, he did not indicate which of the criteria she satisfied.  (See Tr. 613, 615).

In contrast, the results of the mental status evaluation were based on Dr. Chris' own observations rather than Thomas' subjective statements.  For example, Dr. Chris reported that he found the plaintiff to be "a bit obnoxious at times" but noted that she displayed good eye

contact, and had clear and coherent speech with normal rate and tone.  (Tr. 614).  He also reported that Thomas had difficulty with mathematical calculations, but was alert and oriented times three, displayed no signs of a formal thought disorder or psychosis, and denied any suicidal or homicidal ideation, plan or intent.  (Tr. 614-15).  Dr. Chris further reported that Thomas' insight and judgment were fair to poor, but he described her as "generally affable," and found her to be "engageable and cooperative" during the examination.  (Id.).

The ALJ considered the report of Dr. Chris' consultative evaluation in connection with her assessment of Thomas' RFC, and she relied on Dr. Chris' objective observations to support her assessment of Thomas' credibility.  Specifically, the ALJ noted that "[d]uring consultative psychological examination, aside from obnoxious mood and some difficulty performing calculations, the claimant was otherwise observed to be oriented with intact thought process and memory, as well as denied any suicidal thoughts."  (Dec. 6; Tr. 15 (citation omitted)).  She credited this evidence, and used it to support her conclusion that "the claimant's statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible[.]"  (Id.).

The ALJ did not adopt Dr. Chris' assessment that the plaintiff satisfied nearly all of the listed criteria of a borderline personality disorder.  (See id.).  However, this court finds that her failure to do so was not erroneous.  Dr. Chris' assessment, based on Thomas' subjective statements, was inconsistent with the ALJ's finding that Thomas was not entirely credible, and that the evidence belied Thomas' claim of a disabling mental impairment.  (See id.).  The ALJ's finding in that regard was supported by substantial evidence.

In connection with her determination that Thomas was not fully credible, the ALJ noted that there was little evidence of any ongoing mental health treatment prior to 2011, even though Thomas alleged a disability onset date in 2009.  (Id.).  She also found that objective mental status findings from 2011 and 2012 were largely "unremarkable," and that there was "no evidence of any dedicated, ongoing mental health treatment since 2012[.]"  Additionally, the ALJ found it significant that some of the plaintiff's own reports and admissions were inconsistent with her claim of disabling mental limitations.  (Id.).  In particular, the ALJ noted that Thomas had a boyfriend, was able to perform certain activities of daily living, and was capable of handling money.  (Id.).  She also pointed out that Thomas' testimony, in which she stated that "she could probably work in a small area without people," further undermined the plaintiff's claims regarding the limiting effects of her mental impairments.  (Id.).  Thomas has not challenged these findings, which substantially support the ALJ's conclusion that Thomas' statements regarding the limiting effects of her symptoms were "not entirely credible[.]"  (See id.).  Accordingly, there was no error in the ALJ's failure to credit Dr. Chris' determination, based on Thomas' subjective statements, that Thomas displayed all, or nearly all, of the symptoms listed in the DSM-IV definition of a borderline personality disorder.  Nor was it improper for the ALJ to rely on a hypothetical that did not include a 20 percent off-task limitation, or to disregard the VE's testimony on cross-examination.

## IV. CONCLUSION

For all the reasons detailed herein, the plaintiff's "Motion to Reverse" (Docket No. 13) is DENIED, and the "Defendant's Motion to Affirm the Commissioner's Decision" (Docket No. 25) is ALLOWED.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge